UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

EFS, INC., EFS, INC. 401 (k) PLAN,           )
MICHAEL EGAN, as trustee of the              )
EFS, INC. 401 (k) PLAN, GRASSWORX            )
SE, LLC, GRASSWORX SE, LLC                   )        No. _____
401(k) PLAN, MICHAEL EGAN,                    )
trustee of the GRASSWORX SE,                  )        JURY DEMAND
LLC 401(k) PLAN, MASTRAPASQUA                 )
ASSET MANAGEMENT, INC.,                       )
MASTRAPASQUA ASSET MANAGEMENT, )
INC. 401(k) PLAN, FRANK                       )
MASTRAPASQUA and MAURO                        )
MASTRAPASQUA, as trustees of the             )
MASTRAPASQUA ASSET MANAGEMENT, )
INC. 401(k) PLAN, GONZALES COUNTY             )
HOSPITAL DISTRICT, GONZALES                   )
COUNTY HOSPITAL DISTRICT 401(k)               )
PLAN, TIM MARKMAN, GREG PETEREK,              )
JOHN FRITZ, LISA GINDLER, and                 )
BARBARA KORINACEK, as trustees of the )
GONZALES COUNTY HOSPITAL DISTRICT)
401(k) PLAN, THE HAMILTON-                    )
RYKER GROUP, LLC, THE HAMILTON-               )
RYKER GROUP, LLC 401(k) PLAN,                 )
WAYNE MCCREIGHT and CRAWFORD                  )
GALLIMORE as trustees of THE                  )
HAMILTON RYKER GROUP, LLC, 401(k)             )
PLAN, INDEPENDENT PRESS                       )
ASSOCIATION, INDEPENDENT PRESS                )
ASSOCIATION 401(k) PLAN, RICHARD              )
LANDRY and BONNIE WALSH as                    )
trustees of INDEPENDENT PRESS                 )
ASSOCIATION 401(k) PLAN, TUNED IN             )
BROADCASTING, INC.,  TUNED IN                 )
BROADCASTING, INC. 401(k)  PLAN,              )
LESTER TURNER, JR., as  trustee of the        )
TUNED IN BROADCASTING, INC. 401(k)            )
PLAN, JIMBO'S NATURAL FAMILY,                 )
INC., JIMBO'S NATURAL FAMILY, INC.            )
401 (K) PLAN, JAMES SOMECK and JO             )
ANN DIEHL, as trustees of JIMBO'S             )
NATURAL FAMILY, INC. 401(k) Plan,            )
AS YOU SOW, as Sponsor of the AS             )

YOU SOW 401(k) RETIREMENT SAVINGS )
PLAN, the AS YOUSOW 401(k), TOM VAN )
DYKE, TRUSTEE, SLOAN MORGAN, )
TRUSTEE, DEBORAH NIEDERMEYER, )
TRUSTEE for the DEBORAH )
NIEDERMEYER INDIVIDUAL 401(k), )
BRIAN K. ALLEN, TRUSTEE for the )
BRIAN ALLEN PHOTO INDIVIDUAL 401(k) )
401(k), HERBERT E. POUNDS, JR., )
PC, as Sponsor of the HERBERT E. )
POUNDS JR., PC 401(k) PLAN, )
HERBERT E. POUNDS, JR., PC, )
TRUSTEE, RCSim, as Sponsor of the )
RCSim, INC. 401(k) PLAN, the RCSim, )
INC. 401(k) SAVINGS PLANS, ROBERT C. )
ROSSOW, EDGAR C. PHILLIPS, )
JAMES EDWARD SIMPSON, )
COLBERT & WINSTEAD, PC 401(k) )
PLAN, and RICHARD L. COLBERT and )
KURTIS J. WINSTEAD, as trustees of )
COLBERT & WINSTEAD, PC 401(k) PLAN, )
HERITAGE EQUITY GROUP 401(k) )
SAVINGS PLAN, MAX DULL, Trustee )
of the HERITAGE EQUITY GROUP 401(k) )
SAVINGS PLAN, ABCOW STAFFING )
401(k) RETIREMENT PLAN, ABCOW )
SERVICES, INC., as Sponsor of the )
ABCOW STAFFING 401(k) RETIREMENT )
PLAN, J. MICHAELS CLOTHIERS, INC. )
RETIREMENT PLAN, J. MICHAELS )
CLOTHIERS, INC., as Sponsor of the J. )
MICHAELS CLOTHIERS INC. )
RETIREMENT PLAN, THE BAY )
INSTITUTE OF SAN FRANCISCO )
RETIREMENT PLAN, GRANT DAVIS, )
ROBERT ERICKSON, and JULIA PRICE, )
as Trustees of THE BAY INSTITUTE OF )
SAN FRANCISCO RETIREMENT PLAN, )
SUMMIT TERMINALING SERVICES, )
LLC RETIREMENT PLAN, and SUMMIT )
TERMINALING SERVICES, LLC as )
Sponsor of the SUMMIT TERMINALING )
SERVICES, LLC 401 (k) RETIREMENT )
PLAN, )
                                      )
        Plaintiffs,                   )

v.                                    )
                                      )
REGIONS BANK, as successor in interest )
by merger to AMSOUTH BANK,            )
                                      )
          Defendant.                  )

---

## COMPLAINT

---

### A. <u>PARTIES</u>

1.      EFS, Inc. is a Georgia corporation with its principal place of business in Georgia.  EFS, Inc. 401(k) Plan is a retirement benefit plan established for the benefit of the employees of EFS, Inc.  Michael Egan is trustee of the trust created to hold the assets of this plan.  Mr. Egan resides in Georgia.

2.      Grassworx SE, LLC ("Grassworx") is a Georgia limited liability company with its principal place of business in Georgia. Grassworx SE, LLC 401(k) Plan is a retirement benefit plan established for the benefit of the employees of Grassworx.  Michael Egan is trustee of the trust created to hold the assets of this plan.  Mr. Egan resides in Georgia.

3.      Mastrapasqua Asset Management, Inc. is a Tennessee corporation with its principal place of business in Tennessee. Mastrapasqua Asset Management, Inc. 401(k) Plan is a retirement benefit plan established for the benefit of the employees of the company.  Frank

Mastrapasqua and Mauro Mastrapasqua are trustees of the trust created to hold the assets of this plan and both reside in Tennessee.

4. Gonzales County Hospital District is a governmental entity located in Texas. Gonzales County Hospital District 401(k) Plan is a retirement benefit plan established for the benefit of the hospital's employees. Tim Markman, Greg Peterek, John Fritz, Lisa Gindler, and Barbara Korinacek are residents of Texas and are trustees of the trust created to hold the assets of this plan.

5. The Hamilton-Ryker Group, LLC is a Tennessee limited liability company with its headquarters in Tennessee. The Hamilton-Ryker Group, LLC 401(k) Plan is a retirement benefit plan established for the benefit of the company's employees. Wayne McCreight and Crawford Gallimore are residents of Tennessee and are trustees of the trust created to hold the assets of this plan.

6. Independent Press Association is a not-for-profit entity located in California. Independent Press Association 401(k) Plan is a retirement benefit plan established for the benefit of the employees the company. Richard Landry and Bonnie Walsh are residents of California and are trustees of the trust created to hold the assets of this plan.

7. Tuned In Broadcasting, Inc. is a Tennessee corporation with its principal place of business in Tennessee. Tuned In Broadcasting, Inc. 401(k) Plan is a retirement benefit plan established for the benefit of the employees the company. Lester Turner, Jr. is trustee of the trust created

4

to hold the assets of this plan. He resides in Tennessee and in this judicial district.

8. Jimbo's Natural Family, Inc. is a California corporation with its principal place of business in California. Jimbo's Natural Family, Inc. 401(k) Plan is a retirement benefit plan established for the benefit of the employees of the company. James Someck and Jo Ann Diehl are residents of California and are trustees of the trust created to hold the assets of this plan.

9. Plaintiff As You Sow is a California 501(c)(3) non-profit corporation with its principal place of business in San Francisco, California. Tom Van Dyke and Sloan Morgan are residents of California and are trustees of the trust created to hold the assets of this plan.

10. Plaintiff Deborah Niedermeyer is a resident of the state of Washington.

11. Plaintiff Brian K. Allen is a resident of the state of Washington. Mr. Allen does business as Brian Allen Photographer, which is a sole proprietorship doing business in the state of Washington.

12. Plaintiff Herbert E. Pounds, Jr., PC is a Texas professional corporation with its principal place of business in San Antonio, Texas.

13. Plaintiff RCSim, Inc. is a Texas corporation with its principal place of business in Texas.

14. Plaintiff James Simpson resides in Tennessee and in this judicial district.

5

15. Colbert & Winstead, PC is a Tennessee professional corporation with its headquarters in Tennessee. The Colbert & Winstead, PC 401(k) Plan is a retirement benefit plan established for the benefit of the Colbert & Winsteads employees. Richard L. Colbert and Kurtis J. Winstead are residents of Tennessee and are trustees of the trust created to hold the assets of this plan.

16. The Heritage Equity Group 401(k) Savings Plan is a 401(k) investment plan established for the purpose of providing retirement benefits to the employees of Beck/Arnley Worldparts Corp. ("Beck/Arnley") and an affiliated corporation. Beck/Arnley is a corporation organized under the laws of Delaware and has its principal place of business in this judicial district. Beck/Arnley is a plan sponsor and fiduciary of the Plan. Max Dull is a Tennessee resident and is the trustee of the trust created to hold the assets of the Plan.

17. Abcow Services, Inc. is a California non-profit corporation with its principal place of business in California.

18. J. Michaels Clothiers Inc. ("J. Michaels") is a Tennessee corporation with its principal place of business in Tennessee. J. Michaels established and sponsors for the benefit of its employees the J. Michaels Clothiers, Inc. Retirement Plan.

19. The Bay Institute of San Francisco ("Bay Institute") is a California non-profit corporation headquartered in California. Bay Institute established The Bay Institute Retirement Plan for the benefit of

6

its employees. Grant Davis, Robert Erickson, and Julia Price are trustees of this plan and are residents of California.

20. Summit Terminaling Services, LLC ("Summit") is a Georgia limited liability company with its principal place of business in Georgia. Summit established and is sponsor of the Summit Terminaling Services, LLC 401(k) Retirement Plan.

21. Regions Bank is the successor in interest by merger to AmSouth Bank. At all times relevant to this complaint, AmSouth maintained offices in this district, including one in Dickson, Tennessee, and one in Nashville, Tennessee. AmSouth continues to operate as a division of Regions Bank. Regions Bank's agent for service of process is Corporation Service Company, 2908 Poston Avenue, Nashville, Tennessee 37203. Regions Bank and AmSouth Bank are hereinafter referred to as Regions/AmSouth.

22. Mid-Atlantic Capital Corporation ("MACC"), not a party in this action but defendant in a companion case brought by plaintiffs, is a corporation organized under the laws of the state of Pennsylvania. It maintains a principal office at The Times Bldg, 336 Fourth Ave, Pittsburgh, PA 15222.

## B. JURISDICTION AND VENUE

23. Pursuant to 28 U.S.C. § 1332, this Court has subject matter jurisdiction over plaintiffs' claims because the amount in controversy

with respect to the claims of each of plaintiffs Heritage Equity Group 401(k) Savings Plan, Colbert & Winstead, PC 401(k) Plan, EFS, Inc. 401(k) Plan, Mastrapasqua Asset Management, Inc. 401(k) Plan, Gonzales County Hospital District 401(k) Plan, Hamilton-Ryker Group, LLC 401(k) Plan, Jimbo's Natural Family, Inc. 401(k) Plan, James Simpson, and The Bay Institute Retirement Plan exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship. The Court has supplemental jurisdiction over the claims of the remaining plaintiffs under 28 U.S.C.§ 1367.

24.    Venue properly lies in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events and omissions giving rise to plaintiffs' claims occurred in this judicial district.

### C. **FACTUAL ALLEGATIONS**

### **1Point Solutions**

25.    Each of the plaintiffs in this case engaged Barry Stokes of Dickson, Tennessee and his company, 1Point Solutions, LLC ("1 Point Solutions") to provide various services for their retirement account assets. Mr. Stokes and 1Point Solutions were engaged, among other things, to provide plaintiffs with securities in which to invest their retirement assets, to facilitate those investments, and to provide administrative services with respect to those investments.

8

26.    1Point Solutions was formed to act as a third party administrator ("TPA") for employee plans that were established under federal statutes to provide tax-advantaged benefits to employees.

27.    Generally, 401(k) plan customers of 1Point Solutions were instructed to send checks for their periodic 401(k) contributions to 1Point Solutions, which deposited them in accounts at Regions/AmSouth in the name of 1Point Solutions, usually an account named 1Point 401-K.

28.    During the years 2002-2006, plaintiffs entrusted assets to Mr. Stokes and 1Point Solutions, as follows:

(a)    EFS, Inc. and Grassworx are affiliated companies. EFS, Inc. 401(k) Plan transferred money to Mr. Stokes and 1Point Solutions beginning in 2002 and thereafter. Grassworx 401(k) Plan transferred money beginning in 2005 and thereafter. Altogether, these two plans invested approximately $1.3 million with Mr. Stokes and 1Point Solutions.

(b)    Mastrapasqua Asset Management, Inc. 401(k) Plan transferred money beginning in 2002 and thereafter. Altogether, this plan invested more than $900,000 with Mr. Stokes and 1Point Solutions.

(c)    Gonzales County Hospital District 401(k) Plan transferred money beginning in 2002 and thereafter. Altogether, this plan invested approximately $1.2 million with Mr. Stokes and 1Point Solutions.

(d)     The Hamilton-Ryker Group, LLC 401(k) Plan transferred money beginning in 2002 and thereafter.  Altogether, this plan invested approximately $273,000 with Mr. Stokes and 1Point Solutions.

(e)     Independent Press Association 401(k) Plan transferred money beginning in 2005 and thereafter.  Altogether, this plan invested approximately $71,000 with Mr. Stokes and 1Point Solutions.

(f)     Tuned In Broadcasting, Inc. 401(k) Plan transferred money beginning in 2005 and thereafter.  Altogether, this plan invested approximately $31,000 with Mr. Stokes and 1Point Solutions.

(g)     Jimbo's Natural Family, Inc. 401(k) Plan transferred money beginning in 2002 and thereafter. Altogether, this plan invested approximately $400,000 with Mr. Stokes and 1Point Solutions.

(h)     The As You Sow 401(k) Retirement Savings Plan invested approximately $80,000.

(i)     Deborah Niedermeyer invested approximately $26,000.

(j)     Brian Allen Photography invested approximately $15,000.

(k)     The Herbert E. Pounds, Jr., PC 401(k) Plan invested approximately $266,000.

(l)     The RCSim, Inc. 401(k) Plan invested approximately $40,000.

(m)     James E. Simpson invested approximately $116,000.

(n)     Abcow Staffing 401(k) Retirement Plan transferred money to Mr. Stokes and 1Point Solutions beginning in 2002 and periodically

thereafter until the third quarter of 2006. This plaintiff invested approximately $42,449 with Mr. Stokes and 1Point Solutions.

(o) J. Michaels Clothiers, Inc. Retirement Plan transferred money beginning in 2005 and periodically thereafter until the third quarter of 2006. Altogether, this plan invested approximately $49,186 with Mr. Stokes and 1Point Solutions.

(p) The Bay Institute Retirement Plan transferred money beginning in 2003 and periodically thereafter until the third quarter of 2006. Altogether, this plan invested approximately $147,548 with Mr. Stokes and 1Point Solutions.

(q) Summit Terminaling Services, LLC 401(k) Retirement Plan transferred money beginning in 2003 and thereafter until the third quarter of 2006. Altogether, this plan invested approximately $46,116 with Mr. Stokes and 1Point Solutions.

29. Unknown to plaintiffs, at the time they engaged Mr. Stokes and 1Point Solutions, and on all occasions when plaintiffs entrusted funds to him and his company, Mr. Stokes did not intend to invest plaintiffs' assets appropriately and intended to misappropriate plaintiffs' funds and/or use them in an unauthorized and unlawful manner.

30. In the fall of 2006, plaintiffs learned that Mr. Stokes had stolen the money that plaintiffs transferred to him. Throughout some or all of the time that plaintiffs utilized his services, and unknown to plaintiffs, Mr. Stokes stole and utilized plaintiffs' assets for his own

11

purposes. Mr. Stokes also created and sent to plaintiffs fictitious account statements reflecting alleged asset portfolios that did not exist.

31    Mr. Stokes and 1Point Solutions are now in bankruptcy. Mr. Stokes has been indicted and is in jail.

32.    At the close of its operations, 1Point Solutions was TPA for 52 401(k) plans, including plaintiffs' plans. Because of theft and embezzlement by Barry Stokes, there was not enough money to pay the amount owed to the 401(k) Plans and/or to plaintiffs.

30.    1Point Solutions also acted as TPA for FSAs (flexible spending accounts), HSAs (health spending accounts), HRAs (Health Reimbursement Arrangements) and DCAs (dependent care accounts). 1Point Solutions also acted as third party administrator for a few dental plans and transportation plans. All of these plans are collectively referred to as the "Cafeteria Plans."

**Regions Bank/AmSouth and Regulatory Requirements**

31.    At the outset, 1Point Solutions opened several bank accounts at Regions/AmSouth to hold Cafeteria Plan funds. These include accounts named 1Point FSA, 1Point FSA Depository Acct, 1Point HSA, and 1Point Solutions DCA. Stokes opened at least 58 bank accounts at Regions/AmSouth. 1Point Solutions customers were instructed to send all funds to 1Point Solutions, which deposited the funds into these accounts.

32. Banks and broker-dealers in securities are subject to the Bank Secrecy Act, certain provisions of the USA PATRIOT Act, and the U.S. criminal statutes for money laundering. Implementing regulations of the Bank Secrecy Act are promulgated and enforced by the Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") often in collaboration with the Federal Functional Regulators. These regulations impose a range of anti-money laundering compliance requirements on the regulated institutions in the United States. Supervision and enforcement for these compliance efforts are undertaken by FinCEN and the functional regulators.

33. Banks and broker-dealers in securities are required to have implemented Customer Information Programs to adequately obtain and verify the identity of persons or entities that are opening accounts with them or establishing other on-going business relationships. Banks and broker-dealers in securities must design their programs to enable them to establish a "reasonable belief" that they know the true identity of the customer. Also, the bank or broker-dealer in securities must establish policies and procedures for Customer Due Diligence ("CDD") and Enhanced Due Diligence ("EDD") that is commensurate for the level of money laundering risk or terrorist financing risk posed by a particular customer or category of customers.

34. Banks and broker-dealers are required to implement policies and procedures to meet the record keeping requirements of the Bank

Secrecy Act (e.g., the reporting of large currency transactions into or out of an account or the purchase of monetary instruments for $3,000 or more). In addition to recording the information, these financial institutions must retain this documentation for a period of five years, and must determine, based on their risks posed by their customer base and the services provided, what type of ongoing monitoring should be implemented in order to detect and report unusual or suspicious activity.

35. Broker-dealers in securities and mutual funds are required by regulations issued by FinCEN and their primary functional regulator to file suspicious activity reports ("SARs") when transactions involve or aggregate to at least $5,000 and are (1) known or suspected criminal violations where the broker-dealer or mutual fund is either an actual or potential victim of a criminal violation, or the broker-dealer or mutual fund is used to facilitate a criminal transaction, or (2) are transactions that (a) involve funds derived from illegal activity intended or conducted to hide or disguise funds derived from such illegal activity . . . to violate or evade any federal law or regulation or to avoid any transaction reporting requirement under federal law or regulation; (b) designed, whether through structuring or other means, to evade the requirements of the Bank Secrecy Act; or (c) appear to serve no business or apparent lawful purposes, and for which the broker-dealer or mutual fund know no reasonable explanation after examining the available facts relating to the transaction and the parties.

36.     Suspicious activity reporting rules for banks are similar and require that any transaction conducted or attempted by, at or through the bank involving or aggregating $5,000 or more in funds or other assets that the bank knows, suspects or has a reason to suspect  (a) involves funds derived from illegal activities or is intended or conducted in order to hide or disguise funds or assets derived from illegal activities (including without limitation, the ownership, nature, source, location, or control of such funds or assets) as part of a plan to violate or evade any law or regulation or to avoid any money laundering regulation; (b) is designed to evade a money laundering regulation, for example, a cash reporting regulation; or (c) has no business or apparent lawful purposes or is not the sort in which a particular customer would normally be expected to engage and the bank knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction, must be reported.

37.     The Federal Financial Institutions Examination Council has provided a list of red flags for banks to help them determine whether a SAR is required.  These indicators point to situations in which the bank should perform additional due diligence to determine whether the bank should file a SAR.  These include the following:

•     A customer who conducts a number of transactions, which individually do not meet reporting

requirements, such as for currency transactions, but taken together, do reach such levels.

• Numerous transactions are conducted in even dollar amounts.

• Transactions not consistent with the customer's known business or income level.

• A customer maintains multiple accounts at a bank for no apparent legitimate reason. Inter-account transfers are evidence of common control.

• Accounts with a high volume of activity, which carry low balances or are frequently overdrawn, may be indicative of money laundering.

• A customer repeatedly buys a number of official bank checks with no apparent legitimate reason.

• Frequent wire transfers are not be justified given the nature of the business of the customer.

• The customer has a high volume of incoming and outgoing wire transfers but maintains low or overdrawn account balances.

• There is a pattern of wire transfers of similar amounts both in and out of the customer's account on the same day or the next day.

38.    All banks and broker-dealers are required to establish and maintain procedures and systems to enable them to comply with the FinCEN Laws, and the guidance provided by regulatory agencies.  These systems require a group of people and automated computer monitoring.  Computerized systems also include detection protocols for finding overdrafts, payments against uncollected funds, and potential Ponzi schemes, among other things, to enable users to protect themselves against fraud, and to guard against money laundering and other crimes.

39.    On information and belief, plaintiffs assert that Regions/AmSouth had computer and other systems in place at all relevant times to assure its compliance with the FinCEN Laws.  In addition, as of October 2004, Regions/AmSouth was required by the terms of a consent order with the Federal Reserve Board to have such systems in place.  Among other things, the consent order requires Regions/AmSouth to develop a management and reporting structure for its anti-money laundering compliance, customer due diligence, and fraud detection programs appropriate for its size and complexity, and to insure that these departments are adequately staffed.

40.    Regions/AmSouth knew that 1Point Solutions was a TPA, and that as part of its business, 1Point Solutions received contributions from employers and employees to be held as property of ERISA plans and distributed solely in furtherance of the purposes of the participants and beneficiaries of those plans.

41.     1Point Solutions was a large customer of Regions/AmSouth in Dickson, TN, depositing and withdrawing large sums of money each month.  Stokes and his employees went to the Regions/AmSouth branch in Dickson, TN, almost every business day, depositing large numbers of checks, purchasing cashier's checks, and transferring money from one account to another.  Defendant charged 1Point Solutions more than $500,000 during the course of their dealings.

42.     Regions/AmSouth opened a number of accounts for 1Point Solutions with names that directly reference the business of 1Point Solutions as TPA, such as 1Point 401(k), 1Point FSA and 1Point HSA. Regions/AmSouth knew that the funds deposited in such accounts came from customers of 1Point Solutions, and that the funds did not belong to 1Point Solutions, but were held in trust to be used solely for the participants and beneficiaries of ERISA plans.

43.     Each month, Regions/AmSouth received deposits by check or ACH from employers representing contributions to their 401(k) plans. Regions/AmSouth knew that these were deposits for such purpose, and that the funds did not belong to 1Point Solutions, but were held solely for the benefit of the plans and their participants.   1Point's 401(k) Plan clients deposited in excess of $5,700,000 at Regions/AmSouth.  Cafeteria Plan clients sent an estimated $45,000,000 to accounts opened by 1Point Solutions at Regions/AmSouth.

44.     An additional estimated $1,400,000 was transferred from Fifth Third Bank, where 1Point Solutions briefly banked in early 2006, to 1Point Solutions accounts at Regions/AmSouth.

45.     On information and belief, Barry Stokes originally asked Regions/AmSouth to set up individual accounts for each of his numerous HSA clients.  Individual accounts were required in order for defendant to comply with the above-referenced obligation of the defendant to know the customer it was doing business with.  But Regions/AmSouth told Mr. Stokes that individual accounts were too much trouble and that he should use an omnibus account.  In that way, defendant violated its own legal obligations and ultimately made it easier for Mr. Stokes to embezzle customer funds.

46.     The transactions in the 1Point Solutions accounts at Regions/AmSouth triggered numerous red flags under the FinCEN law and guidance.  The red flags in turn triggered a duty on the part of Regions/AmSouth to investigate and determine whether it had further duties under the FinCEN laws, including the requirement that it file a SAR. The red flags included the following:

- •     The 1Point Solutions accounts for Cafeteria Plans did not function as would be normal for Cafeteria Plans.

- •     HSA accounts are by statute unique to each individual. None of the HSA accounts can be identified to an individual.

Deposits to the 1Point HSA account were commingled with other 1Point Solutions accounts at Regions/AmSouth.

- Accounts for other Cafeteria Plans are unique for each employer. Deposits to 1Point Solutions accounts for such Cafeteria Plans were commingled. Substantially all deposits were made to a single account. Then some funds were transferred to other accounts, including accounts in the name of an employer, and to 1Point Solutions operating accounts.

- At random times, the 1Point 401(k) accounts at Regions/AmSouth received large infusions of cash. Wire advices for those infusions show that they were sent from the same source, MACC.

- Checks were drawn on the 1Point 401(k) Plan account at Regions/AmSouth in small, odd dollar amounts typical of Cafeteria Plans, not the smaller number of larger, irregular payments that would be expected in the bank account of a 401(k) Plan.

- Funds in the 1Point Solutions accounts at Regions/AmSouth were regularly used to pay 1Point Solutions' business expenses. It is not normal to pay business expenses from accounts of Cafeteria Plans or 401(k) Plans.

47.     On many occasions between January 2003, and September 2006, Stokes withdrew substantial sums from his business and personal accounts in the form of cashier's checks or cash in amounts which individually did not trigger the requirement for a Currency Transaction Report ($10,000), but taken together did require such a report. For example, during the period October 1, 2003 to December 31, 2003, Stokes cashed 18 checks written on his personal account at Regions/AmSouth. Total cash exceeded $125,000. Of these checks, eleven were cashed in amounts greater than $9,000 but less than $10,000. These transactions should have triggered Currency Transaction Reports, and should have been brought to the attention of responsible officers at Regions/AmSouth.

48.     During the period October 1, 2003 to December 31, 2003, Stokes transferred over $400,000 from the 1Point 401(k) account at Regions/AmSouth into his personal account at Regions/AmSouth. These transfers enabled him to withdraw cash and purchase cashier's checks from his personal account in excess of $300,000.

49.     On a number of occasions, Stokes withdrew funds from the Regions/AmSouth 1Point 401(k) account for his personal use. For example, on August 16, 2002, Stokes obtained a cashier's check from the 1Point 401(k) account in the amount of $246,045.10 made payable to himself. On August 30, 2002, Stokes obtained a cashier's check from the 1Point 401(k) account in the amount of $115,308.27 made payable to

himself. On May 31, 2005, Stokes wired $659,398.48 from MACC to the 1Point 401(k) account at Regions/AmSouth. That same day, he obtained a cashier's check in the amount of $155,286.81 made payable to himself. Contemporaneously with each of these transfers, Stokes purchased real estate in Dickson, TN, in his own name using the cashier's checks.

50. Stokes regularly transferred money from one Regions/AmSouth bank account to another. These transfers took place by ACH, wire transfer, check, counter check, and telephone transfer. Many of these transfers took place to make up for overdrafts in the accounts. Such transfers were not consistent with a legitimate business enterprise.

51. Stokes regularly used money in the Regions/AmSouth accounts to pay 1Point Solutions' business and operating expenses and for personal purposes. Regions/AmSouth regularly withdrew its fees and analysis charges from the trust funds it held. Defendant knew or should have known that such an arrangement was improper. The aggregate of such fees was in excess of $500,000.

52. 1Point Solutions moved its accounts from Regions/AmSouth to Fifth Third Bank effective January 2, 2006. Almost immediately, the new accounts showed large overdrafts and related charges. Fifth Third closed most of the accounts in late March, 2006, for improper activity. 1Point Solutions moved back to Regions/AmSouth.

53.     1Point Solutions established at least 58 accounts at Regions/AmSouth, most of which were accounts in the names of 1Point Solutions customers, such as plaintiffs.  Money was transferred among accounts opened by 1Point Solutions.  This was often done to make up for overdrafts.  Again, these were additional signals to defendant that 1Point was not a legitimate business enterprise.

54.     On one or more occasions, when a check sent by 1Point Solutions to one of its clients bounced, Regions/AmSouth sent a letter to the 1Point client untruthfully representing that the overdraft was the fault of the bank rather than the fault of 1Point.  In this way, defendant knowingly assisted 1Point Solutions in retaining clients it was defrauding.

55.     Regions/AmSouth knew that 1Point Solutions was a TPA.  It knew that it was holding funds for the benefit of 401(k) plans and for the benefit of Cafeteria Plans.  Regions/AmSouth knew that it was a trustee for those funds.

56.     Regions/AmSouth knew that Stokes was withdrawing large sums of money in transactions which individually do not require a Currency Transaction Report, but taken together, do reach such levels. Regions/AmSouth knew that Stokes regularly withdrew cash in amounts just below the amount that would require a Currency Transaction Report.

57.    Regions/AmSouth knew that Stokes was using cashier's checks and other transfers to withdraw substantial amounts of money from fiduciary accounts for his personal benefit.

58.    Regions/AmSouth knew or should have known that Stokes was using wire transactions to send money from fiduciary accounts to accounts that were not related to the fiduciary business of the accounts.

59.    Regions/AmSouth knew that Stokes was conducting a large number of transactions in even dollar amounts.    Many of those transactions were for his personal benefit, or were sent to accounts that were not related to the fiduciary business of the accounts. Many of the transfers appear to have been structured to avoid the currency transfer reporting laws.

60.    Regions/AmSouth knew that the transactions in its accounts were not consistent with the TPA business of 1Point Solutions.

61.    Regions/AmSouth knew that the multiple accounts maintained by 1Point Solutions had no business purpose.  The constant inter-account transfers evidence common control, and had no business purpose.

62.    Regions/AmSouth knew that the accounts were overdrawn. It knew known that there was a high volume of activity, but the collected funds and the average balances were low.

24

63.     Regions/AmSouth knew that Stokes was buying an unusual volume of cashier's checks.   There was no legitimate business purpose for such purchases.

64.     There were a number of wire transfers from an account bearing a fiduciary name.   Regions/AmSouth knew or should have known that the proceeds of those wire transfers were not used for fiduciary purposes, but for the ongoing business of 1Point Solutions.

65.     Regions/AmSouth knew or should have known that there was an unreasonably high volume of wire transfers and cashier's checks, in connection with frequently over-drawn accounts.

66.     Regions/AmSouth knew or should have known that there was a pattern of wire transfers followed by withdrawals or disbursements very shortly thereafter.

67.     Regions/AmSouth collected a total of $508,210.70 from 1Point Solutions in bank fees.   Regions/AmSouth knew that the volume of the fees it was charging was unreasonable, given the nature of the accounts.

68.     Regions/AmSouth knew or should have known that it was allowing fiduciary accounts to be commingled and overdrawn.

69.     The egregiousness of Regions/AmSouth's failure to prevent Mr. Stokes' unlawful conversion of plaintiffs' funds is compounded by the fact that Mr. Stokes' had a public record of other misconduct and financial problems.   This record includes the following:

(a)  Mr. Stokes took bankruptcy in 1984.

(b)  A company owned by Mr. Stokes took bankruptcy in 1984.

(c)  In December 2000, Mr. Stokes was terminated by The Advisor Group because he failed to cooperate with the firm's investigation of Mr. Stokes' receipt of funds from a client and provided The Advisor Group with falsified documentation.

(d)  In March 2001, Mr. Stokes received a formal caution from the NASD because he had failed to disclose certain outside business activities to The Advisor Group as required by NASD rules.

70.    Money entrusted by all plaintiffs to 1Point Solutions was deposited into Regions/AmSouth.  Plaintiffs bring this action to recover the losses they have suffered as a result of the misconduct of defendant and Stokes/1Point.

## D. LEGAL CLAIMS

### COUNT ONE – AIDING AND ABETTING COMMON LAW FRAUD

71.    Plaintiffs incorporate herein paragraphs 1-70 above.

72.    In connection with his dealings with plaintiffs, Barry Stokes intentionally and recklessly employed devices, schemes, and artifices to defraud, made material misrepresentations, failed to disclose material information, and engaged in acts, practices, and a course of business which operated as a fraud or deceit on the plaintiffs, all in violation of the common law of fraud.

73.   Plaintiffs reasonably relied on Mr. Stokes' representations and were unaware of the true facts.

74.   Plaintiffs have been damaged as a result of Mr. Stokes' misconduct.

75.   Defendant knew that Mr. Stokes was mishandling and transferring plaintiffs' assets without authorization, that he was using fiduciary assets in inappropriate ways, and that he was sending them to entities that had no right to plaintiffs' assets.  Despite this knowledge, defendant provided material assistance to Mr. Stokes' improper activities.

76.   In addition, defendant had a duty to monitor the accounts in which plaintiffs' assets were deposited at Regions/AmSouth in accordance with the legal obligations set forth above and pursuant to the common law of Tennessee.  Defendant gave substantial assistance to Mr. Stokes' misconduct and defendant's own conduct, separately considered, constituted a willful or negligent breach of duties owed to plaintiffs.

77.   Defendant is therefore liable for the damages caused by Mr. Stokes' fraud.

78.   Plaintiffs are entitled to recover from defendant compensation for all plaintiffs' losses, plus interest.

79.   Plaintiffs are also entitled to recover punitive damages because of defendant's reckless and conscious disregard of plaintiffs' rights.

## COUNT TWO – AIDING AND ABETTING CONVERSION

80.    Plaintiffs incorporate herein paragraphs 1-70 above.

81.    Barry Stokes unlawfully converted assets owned by plaintiffs.

82.    Plaintiffs have been damaged as a result of Mr. Stokes' misconduct.

83.    Defendant knew that Mr. Stokes was mishandling and transferring plaintiffs' assets without authorization, that he was using fiduciary assets in inappropriate ways, and that he was sending them to entities that had no right to plaintiffs' assets. Despite this knowledge, defendant provided material assistance to Mr. Stokes' improper activities.

84.    In addition, defendant had a duty to monitor the accounts in which plaintiffs' assets were deposited at Regions/AmSouth in accordance with the legal obligations set forth above and pursuant to the common law of Tennessee. Defendant gave substantial assistance to Mr. Stokes' misconduct and defendant's own conduct, separately considered, constituted a willful or negligent breach of duties owed to plaintiffs.

85.    Defendant is therefore liable for the damages caused by Mr. Stokes' fraud.

86.    Plaintiffs are entitled to recover from defendant compensation for all plaintiffs' losses, plus interest.

87.     Plaintiffs are also entitled to recover punitive damages because of defendant's reckless and conscious disregard of plaintiffs' rights.

## COUNT THREE – AIDING AND ABETTING FIDUCIARY BREACH

88.     Plaintiffs incorporate herein paragraphs 1-70 above.

89.     In violation of his fiduciary duties, Barry Stokes unlawfully converted assets owned by plaintiffs.

90.     Plaintiffs have been damaged as a result of Mr. Stokes' misconduct.

91.     Defendant knew that Mr. Stokes was mishandling and transferring plaintiffs' assets without authorization, that he was using fiduciary assets in inappropriate ways, and that he was sending them to entities that had no right to plaintiffs' assets.  Despite this knowledge, defendant provided material assistance to Mr. Stokes' improper activities.

92.     In addition, defendant had a duty to monitor the accounts in which plaintiffs' assets were deposited at Regions/AmSouth in accordance with the legal obligations set forth above and pursuant to the common law of Tennessee.  Defendant gave substantial assistance to Mr. Stokes' misconduct and defendant's own conduct, separately considered, constituted a willful or negligent breach of duties owed to plaintiffs.

93.     Defendant is therefore liable for the damages caused by Mr. Stokes' breach of his fiduciary duty.

29

94.     Plaintiffs are entitled to recover from defendant compensation for all plaintiffs' losses, plus interest.

95.     Plaintiffs are also entitled to recover punitive damages because of defendant's reckless and conscious disregard of plaintiffs' rights.

## COUNT FOUR – NEGLIGENCE

96.     Plaintiffs incorporate herein paragraphs 1-95 above.

97.      Defendant had a duty to monitor the accounts in which plaintiffs' assets were deposited at Regions/AmSouth in accordance with the legal obligations set forth above and pursuant to the common law of Tennessee.

98.     In violation of that duty of care, defendant allowed 1Point Solutions to mishandle and plaintiffs' assets, use those assets in inappropriate ways, and transfer them to entities that had no right to plaintiffs' assets.

99.     Plaintiffs were damaged as a proximate result of defendant's negligence.

100. Plaintiffs are entitled to recover from defendant compensation for all plaintiffs' losses, plus interest.

## COUNT FIVE – UNJUST ENRICHMENT

101.  Plaintiffs incorporate herein paragraphs 1-100.

102.  Defendant received a large number of fees as a result of its negligent and improper business relationship with 1Point Solutions and Barry Stokes.  Defendant was unjustly enriched in this regard.

103.  Defendants should be ordered to return to plaintiffs all or a fair portion of the fees with which defendant was unjustly enriched.


THEREFORE, plaintiffs respectfully request that the Court:

(a)     Award judgment in favor of each plaintiff and against defendant for all losses incurred by plaintiffs as a result of the misconduct set forth above.

(b)     Order defendant to return to plaintiffs all or a fair portion of the fees with which defendant was unjustly enriched.

(c)     Award prejudgment interest and attorneys' fees in favor of each plaintiff.

(d)     Award punitive damages in favor of each plaintiff and against defendant in such amount as the jury deems proper.

(e)     Afford plaintiffs a trial by jury.

(f)     Provide such relief as the Court deems to be just and proper.


Respectfully submitted,


*/s/ H. Naill Falls Jr.*
H. Naill Falls Jr., BPR # 6787

31

John B. Veach III, BPR # 8994
FALLS  & VEACH
1143 Sewanee Rd.
Nashville, TN 37220
615/242-1800

Attorneys for Plaintiffs